Samuel GILBERT *v.* STATE of Arkansas

CR 99-1059                                     19 S.W.3d 595

Supreme Court of Arkansas
Opinion delivered June 15, 2000

*John B. Plegge*, Judge;

*Montgomery, Adams & Wyatt, PLC*, by: *Dale E. Adams*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Samuel Gilbert brings this appeal from his conviction on five drug-related charges: 1) simultaneous possession of a firearm and a controlled substance; 2) possession of a controlled substance (methamphetamine) with intent to deliver; 3) possession of drug paraphernalia; 4) maintaining a drug premises; and 5) possession of a controlled substance (marijuana). For these convictions, Gilbert received a sentence of nine-and-a-half years in prison. He now asks us to reverse his convictions because, he argues, the trial court erred in denying his motion to suppress evidence seized pursuant to a stale search warrant, and because there was insufficient evidence to support his conviction for simultaneous possession of drugs and a firearm. The question of

whether a search warrant can go stale before it is executed is an issue of first impression; therefore, we take jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We affirm.

On February 5 and 6, 1997, North Little Rock police officers used a confidential informant to negotiate two controlled buys out of a house on Batesville Pike in North Little Rock. While inside the house, the informant saw at least two handguns and a shotgun. On February 7, Officer Rick Dunaway obtained a warrant that could be executed at any time or the day or night because the police would be unable to gain safe and speedy access into the house. The warrant further provided that it was to be executed "within a reasonable time not to exceed sixty days."

Forty-six days later, on March 25, 1997, the warrant was executed while Gilbert was present at the house. During the search, the officers found evidence of methamphetamine. In addition, the officers found an unloaded .41 caliber Smith & Wesson handgun in an open case on the living room floor; thirteen rounds of ammunition were nearby in a paper bag. Ten grams of methamphetamine were found in a plastic bag in Gilbert's pants pocket.

Gilbert moved to suppress the evidence seized from the house, arguing that the search warrant had become stale by the time it was executed.[1] At the hearing on the suppression motion, Officer Dunaway testified that the reason the police waited forty-six days to execute the warrant was because Gilbert was going and coming to and from the house at all hours of the day and night, and Dunaway never had the five or six hours necessary to assemble a SWAT team to conduct a high-risk search. He stated he wanted to execute the warrant with Gilbert at home to avoid any questions as to whom the drugs belonged. The trial court denied Gilbert's motion.

At Gilbert's bench trial, the State introduced the evidence seized pursuant to the warrant. Nick Dawson, a chemist for the State Crime Lab, testified that the residue found included methamphetamine and marijuana. At the close of the State's case, Gilbert moved to dismiss the charge of simultaneous possession of drugs and a firearm, on the grounds that the firearm was in a case

---

[1] Gilbert also moved to suppress on the grounds that the confidential informant was not reliable; however, this point is not a part of his appeal.

and unloaded. The prosecutor responded that the gun was located in the same room as Gilbert, and that he had more than ten grams of methamphetamine in his pocket. The court denied Gilbert's motion.

Gilbert then testified in his own behalf, stating that he rented the house on Batesville Pike, but claimed he was not living there between February and March of 1997. He asserted that he only rented the North Little Rock house on the day of the search. On cross-examination, Gilbert averred that he did not know how the methamphetamine got in his pockets. At the close of his case, Gilbert renewed his motion to dismiss the simultaneous possession charge, and he also renewed his motion to suppress. The trial court again denied Gilbert's motions, and found him guilty.

For his first point on appeal, Gilbert argues that the trial court erred in denying his motion to suppress the evidence seized from his house because the officers' search warrant was stale. When this court reviews a trial court's ruling on a motion to suppress, we review the evidence in the light most favorable to the State and make an independent determination based upon the totality of the circumstances. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). Further, this court will only reverse a trial court's ruling on a motion to suppress if the ruling was clearly erroneous. *Id.*

Rule 12.3(c) of the Arkansas Rules of Criminal Procedure provides that a search warrant shall be executed within a reasonable time, not to exceed sixty days. Although the question of whether information in a search warrant can go stale before its execution is an issue this court has not yet addressed, Arkansas case law has decided whether such information can become stale before the warrant is issued. For the most part, these cases hold that a delay in applying for a warrant can diminish probable cause, but that the delay is "not considered separately, [and] the length of the delay is considered together with the nature of the unlawful activity and in the light of common sense." *White v. State*, 47 Ark. App. 127, 134, 886 S.W.2d 876 (1994). Moreover, the Arkansas Court of Appeals has held that when the criminal activity is "of a continuing nature," an issuing magistrate may utilize his or her common sense regarding the relative staleness of the information on which the warrant is sought. *Cardozo & Paige v. State*, 7 Ark. App. 219, 646 S.W.2d 705 (1983). In *Cardozo*, the court adopted the following rationale:

The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: The character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.

*Cardozo & Paige*, 7 Ark. App. at 222, 646 S.W.2d at 707. We agree with the foregoing reasoning. In short, circumstances surrounding the issuance of a search warrant are interpreted in light of common sense, and this analysis can be extended by analogy to the execution of a warrant.

■ In addition, while probable cause must exist at the time the warrant is issued, not at an earlier time, a lapse of time is not necessarily the controlling consideration. *Watson v. State*, 308 Ark. 643, 826 S.W.2d 281 (1992) (citing *United States v. Stevens*, 525 F.2d 33 (8th Cir. 1975), and *United States v. Ellison*, 793 F.2d 942 (8th Cir.), *cert. denied*, 470 U.S. 415 (1986)). Other factors include the nature of the criminal activity and the type of property sought, considered in the light of common sense. *Id*. A delay is less significant when the search warrant lists items innocent on their face as opposed to *per se* inculpatory items that probably would remain in a suspect's residence for a short period of time. *Id*.

■ ■ Applying all of these factors to the case at hand, it is clear that the warrant had not become stale before it was executed. Gilbert was suspected of running a meth lab and maintaining a drug premises, which is the kind of activity that would not likely be dismantled quickly. The North Little Rock Police Department had the house under surveillance, as can be inferred from Officer Dunaway's testimony that Gilbert was coming and going at all hours and was never home for the five or six hours the police needed. In these circumstances, the officers would have known if the activity had ceased. Although the items recited in the warrant were *per se* inculpatory (the warrant listed controlled substances, related paraphernalia, and any paperwork associated with selling the drugs), that is not the only factor to consider in examining the delay. Viewed in the light of common sense, it cannot be said that the warrant had

become stale by the time it was executed; thus, the trial court did not err in denying Gilbert's motion to suppress.

■ For his second point, Gilbert argues that the trial court erred in refusing to direct a verdict on the simultaneous possession charge. When we review a challenge to the sufficiency of the evidence, we will affirm the conviction if there is substantial evidence to support it, when viewed in the light most favorable to the state. *Dodson v. State*, 341 Ark. 41, 14 S.W.3d 487 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resort to speculation or conjecture. *Id.* Only evidence supporting the verdict will be considered. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

■ Ark. Code Ann. § 5-74-106 (Repl. 1997) provides that no person shall unlawfully commit a felony violation of § 5-64-401 (Repl. 1997) (manufacturing, delivering, or possessing with intent to manufacture or deliver a controlled substance) or unlawfully attempt, solicit, or conspire to commit a felony violation of § 5-64-401 while in possession of a handgun. § 5-74-106(a)(1). Section 5-74-106(d) provides that it is a defense that "the defendant was in his home and the firearm was not readily accessible for use." Gilbert points out that in order to gain a conviction, the state must prove two elements: 1) he possessed a firearm, *Darrough v. State*, 322 Ark. 251, 908 S.W.2d 325 (1995); and 2) a connection existed between the firearm and the controlled substance. *Johnson v. State*, 333 Ark. 673, 972 S.W.2d 935 (1998); *see also Manning v. State*, 330 Ark. 699, 956 S.W.2d 184 (1997) (some link between the firearm and drugs is required; mere possession of a firearm is not enough).

Gilbert testified that he was asleep on the couch when the officers entered the house to execute the search warrant, although Officer Dunaway testified that Gilbert was standing at the front door. Dunaway found a bag containing ten grams of pure methamphetamine in Gilbert's pants pocket, and numerous drug-related items were found throughout the house. A .41 caliber Smith & Wesson handgun was found in an open case in the living room, and while the gun was unloaded, thirteen rounds of ammunition were in a nearby paper bag. Gilbert was the only person in the house.

■ Gilbert initially argues that there was insufficient evidence that he possessed the gun because he claimed he was in a different room than the one where the gun was found. However, in *Darrough,* the defendant was found in a bedroom, and a gun was located in the living room. Despite this fact, this court held sufficient evidence existed to prove the crime of simultaneous possession of drugs and a firearm. *Darrough,* 322 Ark. at 253-54, 908 S.W.2d at 327. Likewise, in *Manning,* the defendant was in the kitchen, and the gun was in a closet in the bedroom. *Manning,* 330 Ark. at 700-01, 956 S.W.2d at 186. Gilbert concedes that the house was small, and although the physical relationship between Gilbert and the gun is not entirely clear from the trial testimony, Gilbert, who admitted having rented the house, was the only person present in the house when it was searched. Thus, there was ample evidence he possessed the gun.

■ Next, Gilbert argues that there was no proof that the gun and the drugs were in any way connected. He asserts that though there might have been some drugs somewhat near because the house was small and everything was near to everything else, there was still no connection shown between the drugs and the firearm. However, the testimony of Officer Dunaway indicated that there were drugs and drug paraphernalia located in rooms throughout the house, including the living room, and drugs were also found in Gilbert's pants. The gun was also in the living room, as were bills and receipts with Gilbert's name and address on them on the coffee table. Viewing this evidence in the light most favorable to the State, there was sufficient evidence of a connection between the drugs and the firearm.

■ Finally, Gilbert argues that he can avail himself of the defense set out in § 5-74-106(d) — that he was in his own home, and the gun was unaccessible for use. However, while his attorney asserted at trial that Gilbert was in his own home in order to claim the statutory defense, Gilbert also testified that he lived in Pine Bluff and was absent from the house on Batesville Pike between February and March of 1997. This conflict in testimony is reflected in his brief where he repeats his testimony that he had been living in Pine Bluff in February and March of 1997 and two pages later asserts that he was at the house "rarely," but then claims that he and the gun were "in his home." In short, the record is conflicting on whether he was "in his own home," as the statutory defense

requires. However, even if that element of the defense was proved, Gilbert still failed to show the gun was inaccessible for use.

 Gilbert argues that the gun was not accessible, because it was unloaded. The State responds that other factors made the gun accessible, namely, that it was in an open case, with ammunition close at hand, such that it could easily have been loaded. If we examine this evidence in the light most favorable to the State, as we are required to do, then it appears that there was sufficient evidence that the gun was accessible for use, and Gilbert cannot avail himself of the defense in § 5-74-106(d).

For the above reasons, we affirm Gilbert's convictions.